Ex. B to McCrary Declaration



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
- - - - - - - - - - - - - X
SEAN OWENS AND MELINDA BEAN on      : 08-CV-02331 (SHM)
behalf of themselves and all others:
similarly situated,                 :

                                    :

-against-                           : United States Courthouse
                                    : Memphis, Tennessee

                                    :

CARRIER CORPORATION,                : July 15, 2010
          Defendant.        : 1:30 p.m.
- - - - - - - - - - - - - X

CIVIL CAUSE FOR FAIRNESS HEARING
BEFORE THE HONORABLE SAMUEL H. MAYS
UNITED STATES DISTRICT COURT JUDGE

- - -

Nicole M. Warren, CSR, RMR, CRR

1                        A P P E A R A N C E S:

2     For the Plaintiffs:

3     Branstetter, Stranch & Jennings, PLLC
      227 2nd Avenue North, 4th Floor
4     Nashville, TN  37201
      **BY:  J. GERARD STRANCH, IV**, ESQ.
5
      The Gardner Firm
6     P.O. Drawer 3103
      210 S. Washington Ave.
7     Mobile, AL  36652
      BY:  M. VANCE McCRARY, ESQ.
8
9     For Defendant:

10    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
      6410 Poplar Ave., Suite 300
11    Memphis, TN  38119
      BY:  FREDERICK J. LEWIS, ESQ.
12    BY:  JEREMY A. IRELAND, ESQ.

13

14

15

16

17

18

19

20

21

22    Court Reporter:                 Nicole M. Warren, CSR, RMR, CRR
                                      Official Court Reporter
23
      **Proceedings recorded by computerized stenography**
24    **Transcript produced by Computer-aided Transcription.**

25

Nicole M. Warren, CSR, RMR, CRR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Fairness Hearing  ......................................... 4

1          (In open court; all parties present.)

2          THE COURT:    This is a Fairness Hearing in the case of

3    Sean Owens and Melinda Bean, on behalf of themselves and all

4    others similarly situated, against the Carrier Corporation.

5          So, who's here?  Who wants to admit to representing

6    whom?

7          MR. STRANCH:    Your Honor, my name is Gerard Stranch.

8    I'm with Branstetter, Stranch, and Jennings appearing on behalf

9    of plaintiffs.

10          Also appearing on behalf of plaintiffs is Vance

11    McCrary of The Gardner Firm.

12          We've got a couple of other introductions we'd like to

13    do as well, your Honor.

14          THE COURT:    Go ahead.

15          MR. STRANCH:    We have with us Ms. Melinda Bean, now

16    Thurston.

17          THE COURT:    Welcome, Ms. Thurston.

18          MR. STRANCH:    And we have Mr. Sean Owens.

19          THE COURT:    Welcome, Mr. Owens.

20          MR. STRANCH:    And Mr. Owens' son, Sage, is a defendant

21    as well.

22          THE COURT:    How are you?  It's a pleasure to have you

23    in court today.

24          How old are you?

25          MR. OWENS:   12.

Nicole M. Warren, CSR, RMR, CRR

1          THE COURT:   Twelve?  I was once 12 myself.  I almost

2    remember it.

3          Who else do you have?

4          MR. STRANCH:   And, your Honor, we've got Mrs. Sherry

5    Eubanks and her great-nephew.

6          And then we've got Mr. Michael Rhodes.

7          These are class members who desire to attend today and

8    just see how our judicial system works.

9          THE COURT:   Well, it's a pleasure to have you today.

10   I have three great-nephews and one great-niece, and I hope you

11   have as much pleasure with your great-niece as I have with

12   mine.  They're wonderful kids.

13          So, we're ready to go forward for the plaintiffs.  Is

14   that right, Mr. Stranch?

15          MR. STRANCH:   That's correct, your Honor.

16          THE COURT:   Who's going to be the principle

17   spokesperson for your group?

18          MR. STRANCH:   Well, your Honor, I was going to do some

19   initial introductions and some discussions; and if you had some

20   specific questions, I was going to turn it over to Mr. McCrary.

21          THE COURT:   Oh, the hard labor goes to Mr. McCrary; is

22   that right?

23          MR. STRANCH:   Your Honor, in the words of Shakespeare,

24   I'm going to set the scene in fair Verona.

25          THE COURT:   You're going to be the stage manager.

1        Yes, Mr. Lewis.  How are you today?

2        MR. LEWIS:   Fine, sir.  Good to see you, Judge.

3   Jeremy Ireland and I are here on behalf of the Carrier.  I

4   haven't told Mr. Ireland this, but he should be the chief

5   spokesperson on behalf of the employer.

6        THE COURT:   Well, Mr. Ireland --

7        MR. IRELAND:   I'm prepared to do so.

8        THE COURT:   -- I look forward to questioning you

9   extensively about this matter.  I'm pleased to hear that you're

10  prepared, and I was a little nervous that I might have to be

11  asking Mr. Lewis questions when I knew that Mr. Ireland had

12  done all the work.

13       Now, let's proceed.  I have a few questions of my own,

14  but I think it's probably in the interest of judicial economy

15  to hear first from the parties.

16       And why don't I hear first from you, Mr. Stranch?

17       MR. STRANCH:   Thank you, your Honor.

18       I think we have an additional class member.

19       MS. ISABEL:   Y'all go right ahead.

20       THE COURT:   What's that?

21       MS. ISABEL:   Y'all go right ahead.  I'm sitting in.

22       THE COURT:   We're going right ahead.  We'd like to

23  meet you first.

24       MS. ISABEL:   Okay.  I'm Ms. Isabel.

25       THE COURT:   Ms. Isabel?

```
1            MS. ISABEL:    Ms. Isabel.

2            THE COURT:    It's good to have you in court today,

3    Ms. Isabel.  Thanks for coming.

4            Now, Mr. Stranch, you may proceed.

5            MR. STRANCH:    Thank you.

6            As the Court is aware, this is a case involving the

7    "Warn Act," a Federal statute that deals with notice prior to

8    layoffs; and as the Court is aware, the procedural history of

9    this case is that the case was filed.  There was some initial

10   litigation that went forward.  We eventually were unable to

11   reach a mutually agreeable resolution to the class

12   certification issues, which was fully briefed before the Court;

13   and the Court then certified a class in this case.

14           At that time there were 785 members of the class.

15   Ten, if the Court will recall, chose to opt out at that time.

16   So, the class that's at issue in this case that the Court has

17   already certified is 775 individual class members.

18           After class certification through discovery and back

19   and forth and the mediation sessions, a settlement was

20   ultimately reached in this case.

21           To give a thumbnail sketch, as the Court remembers, we

22   did discuss this at preliminary approval -- it was in the

23   papers -- but the payment amount was $2.1 million total to the

24   class which represents individual payments to each one of

25   the --
```

1          THE COURT:    We didn't have a preliminary hearing in

2    this matter, did we?

3          MR. STRANCH:    I believe we did it all on the papers,

4    your Honor.

5          THE COURT:    I think we did it all on the papers, too.

6          Go ahead.

7          MR. STRANCH:    But the individual payouts to the class

8    members, as I believe it was Exhibit 1 to the settlement

9    agreement that was filed along with the preliminary approval,

10    ranged from just under $2,000 to just over $15,000 per

11    plaintiff; and that amount depends upon their pay rate and

12    other issues.

13          THE COURT:    Well, that number is a number before

14    attorney fees are withheld.

15          MR. STRANCH:    Yes, your Honor; that is correct.

16          THE COURT:    Okay.  Go ahead.

17          MR. STRANCH:    And as the Court ordered in the

18    preliminary approval, notice was given to the class.  The sworn

19    statement of Mr. Vance McCrary was filed with the Court.  We

20    have heard during the notice period from numerous class

21    members, your Honor.  Even today we've heard from class

22    members.  All the class members that we have spoken with so far

23    have been wholeheartedly in support of the settlement.

24          In fact, the most common question that we've received

25    was:  Can we pick up our check at the Fairness Hearing; or can

1    you do direct deposit for us, please?

2            THE COURT:    I'm not surprised by that question.

3            MR. STRANCH:    And, your Honor, I am happy to report

4    that no objections have been received to the settlement

5    whatsoever.  So, we stand before the Court today requesting

6    final approval of settlement.

7            We have an agreed order, form of an order, for final

8    approval, if the Court would like to take a look at that that

9    we can hand up.

10           THE COURT:    Well, pass it up.

11           COURTROOM DEPUTY:    Thank you.

12           THE COURT:    What else do you want to tell me?

13           MR. STRANCH:    Well, I was going to say we can either

14   do a full presentation, your Honor, or if you have specific

15   questions, we did address them.

16           We would submit to the Court that with no objections

17   and the monetary amounts that are involved in this case that

18   this is a relatively straightforward Fairness Hearing, and we

19   believe that the settlement should be approved in its entirety.

20           So, unless the Court has any specific questions for me

21   or for Mr. McCrary, we would submit it to the Court.

22           THE COURT:    Is there anything you want to add to this,

23   Mr. McCrary?

24           MR. McCRARY:    No, your Honor, not at this time.  I'm

25   happy to answer whatever questions the Court may have.

1          THE COURT:   All right.  How about you, Mr. Ireland?

2          MR. IRELAND:   Not too much, your Honor.

3          Just to let you know that we join the plaintiffs in

4   submitting this to the Court and this defendant has also

5   received no objections to this settlement and we believe it

6   it's a fair settlement.

7          THE COURT:   All right.  Thank you very much.

8          How many -- Mr. McCrary, you're my source of

9   information, right?

10          MR. McCRARY:   Yes, your Honor.

11          THE COURT:   How many -- where are you from?  Alabama?

12          MR. McCRARY:   I'm from Mobile, Alabama, your Honor.

13          THE COURT:   I thought that.

14          MR. McCRARY:   Thank you for the opportunity to appear

15   today.

16          THE COURT:   You're from Mobile itself.  I hope things

17   are going well down there.

18          MR. McCRARY:   Well, the -- they're mired in oil right

19   now, your Honor.

20          THE COURT:   In the Bay and everywhere?

21          MR. McCRARY:   It is in the Bay, all along the Alabama

22   coastline.

23          THE COURT:   Well, that's a shame.  Tough situation.  I

24   was in Gulfport last month and they'd been spared most of it,

25   but I think no longer.

1           MR. McCRARY:    I think no longer.

2           THE COURT:    No.  That's a tough situation all around.

3           How many of these notices were returned?  Who's in

4    charge of mailing those?  Do they go from your office?

5           MR. McCRARY:    They went from my office, your Honor.

6           THE COURT:    And how many were returned undeliverable?

7           MR. McCRARY:    I don't have a precise number, your

8    Honor, and I'm sorry for that, but I believe that the number

9    was less than two dozen.  We have -- in my office we subscribe

10   to a national database that is offered through the Lexis

11   company which seems to offer everything these days.

12          THE COURT:    Right.

13          MR. McCRARY:    When we get a return envelope back, then

14   we mail to folks again and see if we can get them.  It was a

15   very small number, relative to the size of the class.

16          THE COURT:    You think less than two dozen.

17          MR. McCRARY:    I do, your Honor.

18          THE COURT:    And there was an attempt to follow up on

19   those; is that right?

20          MR. McCRARY:    There was, your Honor.

21          THE COURT:    Did you mail to the same addresses that

22   you had?  Did you try to find new addresses for them through

23   the carrier?  How did you handle that part?

24          MR. McCRARY:    We have had a good relationship with the

25   defendants, and they have worked with us to help find

1    information regarding class members.  We did that in some

2    instances.

3              In some instances we found multiple addresses that

4    might perhaps be the address of the class member, and we would

5    mail to all of those.

6              In some cases we would find information about a

7    telephone number, and we would call to find that person at a

8    telephone number and then mail to them.

9              We used every resource that we had.

10             THE COURT:    So, in responding to these less than two

11   dozen returned undeliverable, you feel that you were able to

12   actually reach most of those people as well through subsequent

13   efforts.

14             Is that a fair statement?

15             MR. McCRARY:    That's a fair statement, your Honor.

16             THE COURT:    All right.  That's my principal concern

17   initially is that notice has been delivered.  It appears that

18   it has been.

19             Tell me:  You've made not an affidavit but a

20   declaration that's filed under Document 49 in this cause, and

21   you've discussed the attorney fees at some length.

22             What are the hourly rates that we're talking about for

23   these various lawyers?

24             MR. McCRARY:    The hourly rates vary, as your Honor can

25   see.  There were a number of lawyers who worked on the case,

1    and all of those are outlined.

2              Starting with, I think, the lowest paid attorney on

3    the list, that would be Mr. Tufts.  His rate ranges at 300 and

4    those then range to a rate of $500 an hour for Mr. Stranch and

5    myself and for Mary Olsen.

6              THE COURT:   Let me ask you.  Are those the hourly

7    rates you would ordinarily charge if you billed by the hour, or

8    are those the effective hourly rates based on the return for

9    the fee that you proposed?

10              MR. McCRARY:   Those are the rates that we would

11    normally charge on an hourly basis.

12              THE COURT:   All right.  And those rates are based not

13    on the rate in Mobile or Nashville or Memphis but on -- let's

14    put it this way.  They're based on the fact that the lawyers

15    for the plaintiff and the lawyers for the defendant are

16    practicing nationwide.

17              Is that a fair statement?

18              MR. McCRARY:   That's a fair statement, your Honor.

19              THE COURT:   So, all of you are travelers.

20              MR. McCRARY:   We're very familiar with our suitcase.

21              THE COURT:   You're charging what the market will bear

22    on an hourly basis when you get out, what you're charging

23    hourly rates.

24              Is that a fair statement?

25              MR. McCRARY:   That's correct, your Honor.

Nicole M. Warren, CSR, RMR, CRR

1           THE COURT:    And the market will bear the rates of $300

2     to $500 an hour for matters in the areas in which you have

3     expertise.  Is that fair?

4           MR. McCRARY:    That's correct, your Honor.

5           As a matter of full candor to the Court, to finish

6     describing the categories of the lawyers, Mr. Stranch's rate

7     and mine were at 500; and there are two lawyers at 550.

8     There's one lawyer in that mix whose hourly rate was at 695.

9     That's Mr. Miller.

10          THE COURT:    Mr. Miller is a main partner in what I

11    take to be one of the principle "Warn" litigation firms in the

12    country; and that's what he gets for his time, I suppose.

13          Is that what you're telling me?

14          MR. McCRARY:    That's what he gets for his time, your

15    Honor.  His time in this case was less than 30 hours.

16          THE COURT:    His hourly rate you say is $675.

17          MR. McCRARY:    695, your Honor.

18          THE COURT:    695.  Now I know not only should I have

19    stayed in practice but I should have brought "Warn Act" suits.

20          All right.  So, it's fair to say -- let me be sure

21    I've got it right.

22          The rate runs $300 to $550 for the people who

23    principally worked on the case.  To the extent Mr. Miller was

24    involved, his rate was $695; and your total fees, at least on

25    an hourly basis, are $256,000.

1          MR. McCRARY:    That's correct, your Honor.

2          THE COURT:    A little more than $256,000.  Most of that

3     is going to your lawfirm and The Gardner Firm.

4          MR. McCRARY:    That's correct, your Honor.

5          THE COURT:    All right.  And we're talking about one

6     third of the recovery.

7          MR. McCRARY:    That's what we're requesting, your

8     Honor.

9          THE COURT:    So, it comes out of the settlement amount.

10    That reduces the settlement amount accordingly.

11          Is that a fair statement?

12          MR. McCRARY:    Yes, your Honor.

13          THE COURT:    All right.  Is there anything else I need

14    to know?

15          MR. McCRARY:    The only attorneys fee issue, your

16    Honor, and I think you already know this but just to highlight

17    it, there are things to be done on the case still before it's

18    wrapped up.  There will be time incurred going forward, and all

19    the other factors that are mentioned in the paper I won't

20    bother to repeat to your Honor.  I'm sure you're aware of

21    those, the fact that we litigate these cases very frequently to

22    a point that even where we're successful where there's no

23    recovery at all for us.

24          THE COURT:    All right.  Thank you very much.

25          Do you want to make up some questions for me,

1   Mr. Ireland?

2            MR. IRELAND:   I can't think of any right now, your

3   Honor.

4            THE COURT:   Well, what's the question you would least

5   like to be asked about this settlement?

6            You don't have to answer that, Mr. Ireland.

7            Ms. -- well, I want to call you Ms. Bean but,

8   Ms. Thurston, do you have anything you want to say about this

9   settlement matter?

10            MS. THURSTON:   No, sir.

11            THE COURT:   How about you, Mr. Owens?  Do you want to

12   address the Court about this settlement matter?

13            MR. OWENS:   I'll just briefly state that it was a

14   learning experience for me personally.  I'm glad I took the

15   initiative to get involved and get the case going.  It was a

16   pleasure working with the lawfirms that represented me.  They

17   did a good job.

18            THE COURT:   You feel they did a good job for you.

19            Do you think their fee is reasonable?

20            MR. OWENS:   I most certainly do.

21            THE COURT:   Okay.  We have an open court here today.

22   We have a number of people who are members of the class who are

23   present.  Thank you for being here.

24            Is there anyone here who wishes to speak in favor of

25   this settlement, the settlement as a whole or any aspect of it?

1    Is there anyone who wants to be heard in favor of this

2    settlement?

3              Yes, sir, Mr. Rhodes.  Do you want to come forward

4    where we can see and hear you?

5              MR. RHODES:    Good afternoon, Judge.

6              I think the settlement is a fair settlement.  I think

7    they did a absolutely good job by them getting rid of this case

8    'cause we've been waiting for a long time, and I think they did

9    a good job.

10             THE COURT:    You feel they did a good job.

11             MR. RHODES:    Yes, sir.

12             THE COURT:    Are you pleased?  Are you satisfied with

13   the settlement?

14             MR. RHODES:    I'm satisfied with the settlement.

15             THE COURT:    Do you think it's fair to you?

16             MR. RHODES:    Yes, sir, it's fair to me.

17             THE COURT:    Do you think it's fair to your coworkers?

18             MR. RHODES:    Yes, sir.

19             THE COURT:    Did the lawyers in this case keep you

20   informed about the case?

21             MR. RHODES:    I talked to Mr. Isaac Pace (ph) on the

22   basic, like, every two weeks; and he was letting me know what

23   was going on with the case.  He told me he sent somebody down

24   here, a good representative to represent us; and I think he did

25   a good job by doing that today.

1          THE COURT:    So, if somebody had a similar case, you'd

2    recommend them; is that right?

3          MR. RHODES:    Yes, sir, I would.

4          THE COURT:    Okay.  Thank you very much, Mr. Rhodes.

5          MR. RHODES:    Thank you.

6          THE COURT:    Is there anybody else who wants to be

7    heard in favor of this settlement?

8          THE AUDIENCE:    (No response.)

9          THE COURT:    Is there anybody here who is in opposition

10   to this settlement?

11         THE AUDIENCE:    (No response.)

12         THE COURT:    Is there anyone here who thinks the

13   settlement is not good as a total settlement or that the parts

14   of the settlement are not good?

15         THE AUDIENCE:    (No response.)

16         THE COURT:    Is there anybody who thinks that you

17   haven't gotten what you deserved out of this settlement?

18         THE AUDIENCE:    (No response.)

19         THE COURT:    All right.  Thank you very much.

20         Is there anything else you want to tell me,

21   Mr. Stranch?

22         MR. STRANCH:    The only thing I might add to it, your

23   Honor, is as part of the negotiations of the settlement the

24   plaintiffs agreed not to seek a separate award of expense and

25   cost in this case and instead that that would be taken and

1    eaten out of our fee.

2            THE COURT:    Well, that's quite a word, "eaten out of

3    our fee."  You have a sensitive view about giving that up, do

4    you, Mr. Stranch?

5            MR. STRANCH:    I have a 3 year old that's gaining a

6    pound a week, your Honor.

7            THE COURT:    I've got news for you.  When you get to be

8    my age, you can gain a pound a week, too; and I've been working

9    on it for sometime.

10            Anything else, Mr. Ireland?

11            MR. IRELAND:    I don't believe so, your Honor.

12            THE COURT:    As I said, this is a Fairness Hearing in

13    this case.  This is an action brought to enforce the Worker

14    Adjustment and Retraining Notification Act, sometimes called

15    the "Warn Act."

16            I initially certified the class in this case.  The

17    parties engaged in good faith arm's length negotiations and

18    reached a settlement agreement.

19            I reviewed the proposed settlement and the notice to

20    be given in this case, and I decided that preliminary approval

21    of the settlement agreement was appropriate and that the form

22    and manner of notice to the class were appropriate.

23            I did not feel that we needed to have a hearing, an

24    initial hearing, or a preliminary review hearing or the initial

25    approval because I believe the matter can be relatively

1    straightforward and the matter didn't ring any alarm bells when

2    I reviewed it.

3              There are approximately 775 class members.  Only ten

4    potential members of the class have opted out.  That doesn't

5    necessarily tell me a whole lot, except that it's easier to

6    stay in than opt out in most of these cases in my experience

7    because if you want to opt out, you have to do something.

8              As to the case itself, it arises from a reduction in

9    force, as I recollect it, at the Carrier plant.  Carrier is in

10   in the heating and air conditioning business, if I remember

11   correctly; and the notice was sudden.  There was a significant

12   dispute between the parties about this matter.  I think there's

13   no factual dispute about the failure of the defendant to give

14   the notice required under the "Warn Act."

15             The issue instead turned on whether there was a reason

16   not to have to give the issue -- the notice required because of

17   exigent circumstances.  That's my phrase, not the statute's

18   phrase.

19             It was in my opinion a real dispute.  I don't know how

20   it would have been resolved, and the parties obviously weren't

21   quite confident about how it would have been resolved.  The

22   potential, of course, was for Carrier to wind up with almost

23   $5 million in liability in this case and for the

24   defendant -- rather, for the plaintiffs to have to take

25   nothing, assuming Carrier's position were upheld.

1          The parties have negotiated at some length, have

2     reached a settlement.  The settlement provides on a gross

3     amount I think something like 80 percent to members of Subclass

4     A and 41 percent to members of Subclass B.  Members of Subclass

5     A were actually terminated without notice and the parties'

6     reason, which I accept, was that those individuals were much

7     more likely to recover and, therefore, they should have a

8     higher percentage of recovery.

9          The reasoning was that the other individuals who

10    actually received some notice were, you know, less likely to

11    recover; and I think that also is a reasonable interpretation

12    of the facts and the law.

13          So, I've already said that I -- let me say

14    preliminarily that I think the settlement overall is a good

15    settlement.  I say that because it actually results in money

16    for the people who alleged that they were wronged.

17          It's not a case where you have to be concerned about

18    coupons, for example, where the recovery by the individuals

19    could be elusory.  Individuals may not use the coupons.  The

20    coupons may turn out to be worth very little.

21          It's not a case where there are opportunities offered

22    in the future.

23          It's not a case, a typical case, that you often see a

24    consumer class action where the recoveries are pro forma

25    relative to the legal fees where someone gets $25, for example.

1       This is real money paid to real people.

2       It's also not a case where we have to advertise and we

3  don't know the exact boundaries of the class.  We know the

4  identities of all the individuals in the class; we know the

5  addresses of almost all the individuals in the class; and, in

6  fact, they've been contacted and given actual notice.  So, it

7  hasn't been some vague class definition.  There's a specific

8  class of individuals, known individuals.  There's not an

9  advertising process.  There's direct mail notice, and it

10  appears that actual notice has been given to almost all of the

11  class members.

12       Counsel as officers of the Court has represented that

13  less than two dozen of these notices were returned

14  undeliverable, and most of those were followed up in various

15  ways so that the individuals received actual notice.

16       I reviewed the form of the notice, and the notice is

17  clear.  In other words, it's short and relatively simple.  I'm

18  not saying that everybody in the world could understand it; but

19  within the constraints of notice and class actions, I thought

20  there was clarity in the notice.  Ordinary lay people who paid

21  attention could read it, understand it.

22       So, I think the notice was appropriately given.  In

23  other words, the manner of notice was appropriate.  I think the

24  form of the notice was appropriate, even in retrospect; and we

25  see that in the results of the notice process.

1        And, as I say, in looking over Document 45, which is a

2    sealed document in this case and reveals the net settlement

3    amounts to these individual parties, those amounts all are at

4    least in four figures.  So, we do have real payment to these

5    individuals.  I can't, I suspect, say that often enough.

6        As far as the responses, my sense of the case is that

7    most of the people are very satisfied with their result.  I've

8    heard it here today.  I've heard it from the class

9    representatives.  I've heard it from Mr. Rhodes.  I've heard it

10   from counsel who has gotten a favorable response.

11       I've forgotten the numbers, but it seems to me about

12   50 percent of the time nobody objects.  So, it's not uncommon

13   to have a class action where nobody objects to the settlement

14   and there's not much you can necessarily infer from that but my

15   sense of this case is it's not a passive response but there is

16   a positive response to the settlement and that's consistent

17   with what I think is the payment of real dollars to the members

18   of the class.

19       So, then the question is:  What about the overall

20   quality of the settlement?  I've talked about some of what we

21   call the hot-button issues, the possibility of coupons,

22   so-called negative options with which I'm sure we're all

23   familiar which don't apply to this case.

24       And then, of course, one looks for collusion.  Well,

25   collusion usually is suggested by the amount of the attorney

1   fees relative to the dollar value of the settlement.  I'm going

2   to talk in a minute about the relationship between the attorney

3   fees and the cash that's paid to the members of the class.

4            Most often you find collusion in a situation where you

5   have coupons or something, elusory value, to the class.  This

6   is not a case where collusion would be an issue.  As I said

7   earlier, it's apparent that it was a good faith negotiation

8   among the parties, between the parties.  They were all

9   represented by competent counsel.

10           I've reviewed with care the declaration that

11  Mr. McCrary filed in this case -- it's Document 49 -- and I've

12  looked at the qualifications of plaintiffs' counsel.  They're

13  obviously very highly qualified people who have handled many of

14  these cases before.  In fact, it's their specialty, if you

15  will.  I'm sure some of them have other specialties and that's

16  pointed out in the declaration but both in the Lankenau &

17  Miller case, in the case of the Gibson -- the Gardner lawfirm,

18  rather, and in the case of Mr. Stranch's firm, they're

19  individual who have handled many of these cases, although The

20  Gardner Firm appears to have been -- had the laboring oar, has

21  had access to Mr. Miller, who is certainly one of the nation's

22  leading authorities in this area, and his lawfirm has handled

23  an extraordinary number of these cases.

24           I've got a list of 160 "Warn Act" cases in which right

25  now the Miller firm represented the plaintiffs in the class.

1          Likewise, defense counsel is highly qualified.  I've

2    known Mr. Lewis for many years and have also had the pleasure

3    of having Mr. Ireland in my court.

4          Mr. Lewis is certainly one of the most respected

5    members of the bar in this community and now has a nationwide

6    class where he's old enough to have learned a lot.

7          So, there's no collusion here.  The settlement itself

8    speaks against that.

9          Looking at some of the other factors here, the

10   principal thing that always raises a concern, I think, in and

11   among the parties is the legal fees; and those have been

12   addressed at some length by Mr. McCrary in his declaration.

13         In this Circuit perhaps as a matter of false

14   consciousness, the Court of Appeals has deferred considerably

15   to the District Court in trying to come to a conclusion about

16   the appropriateness of legal fees.

17         We tend not to have to choose between a percentage and

18   a loan star.  I tend to analyze a fee request using both to

19   some extent.  This fee request is on a percentage basis.  The

20   reason to operate down several paths is they reinforce.  In

21   other words, one gives you a test for the other.

22         The factors that I consider have been set out at some

23   length in the opinions of the Court of Appeals of this Circuit

24   and specifically in Bowling against Pfizer.

25         The first one is:  What's the value of the benefit to

1    the plaintiff class?  I've already addressed that.  I think the

2    benefit to the class here is substantial both collectively and

3    individually.  It's a sizable recovery, not a huge recovery;

4    but it's a significant recovery, given the relative smallness

5    to the class.  The benefits to the individuals are substantial.

6              I've looked at the hourly rates based on the

7    representations here.  The hourly rates are, the dollars as

8    taken as a whole are substantially less than the fee requested;

9    but, of course, one has to take into account the factors.

10   Also, the hourly rates are high relative to what I remember

11   about private practice but I will say that even ten years ago

12   when I left the practice, when I was -- eight years ago when I

13   actually left it, $500 an hour would not have been an excessive

14   fee in this market.

15             So, the actual dollar amount for the hourly work is

16   within the realm of reason.  The question is:  Is there a

17   market that's appropriate?  Of course, the beginning point is

18   that this case was undertaken on a contingent fee basis.  So,

19   there's built into it a substantial risk factor.  It's hard for

20   me to tell what the risk factor is in a case of this type but

21   in looking at the nature of this case and similar cases, I'll

22   simply observe that in a "Warn Act" matter, oftentimes the

23   decision is made suddenly, sometimes involuntarily, and to the

24   extent the decision is sudden and involuntary, which is why the

25   notice isn't given, you may be drilling a dry hole.

1          In other words, you may be filing a claim in

2    bankruptcy rather than trying to proceed against an insolvent

3    defendant or you may not be proceeding at all and, of course,

4    the risk is that you proceed against what you take to be a

5    solvent defendant and you discover that the solvent defendant

6    is not solvent.

7          In this case there is a solvent defendant, as it

8    happens; but that's the risk.  It's that in this sort of a case

9    not only do you risk not recovering -- in other words, not

10   prevailing -- but you risk prevailing and finding nothing as a

11   reward for your effort.

12         So, it is a significant factor.  Risk is a more

13   significant factor here than it might otherwise be.

14         I observed that this was an agreed percentage which is

15   probably another reason we don't have an objection to it,

16   because the parties agreed to this percentage at the outset.

17   It was a contractual matter.

18         Society has a substantial stake, I think, in rewarding

19   people who do bring matters of this sort, particularly when

20   they prevail, even though they may prevail on a settlement

21   basis.  It's essential that people like these plaintiffs or the

22   members of this class have their day in court when they are in

23   a position to lose an amount of money like this.

24         So, if there are no attorneys around who will bring

25   cases like this, frankly, those people's rights will never be

1    vindicated.  So, that's an important consideration in this

2    case.

3              It's a public policy consideration.  The Court doesn't

4    often get to consider public policy.  It's usually

5    inappropriate.  So, it's a big day for me.  But I do believe

6    that public policy strongly favors the opportunity for people,

7    working people, to have their day in court; and they couldn't

8    afford a lawyer otherwise.  In other words, this is a case that

9    vindicates the contingent fee.  We hear a lot about, bad things

10   about contingent fee; but I think this case vindicates

11   contingent fees.

12             Is this litigation complex?  Well, it's not so

13   complex, I think; but it is specialized.  In other words, it's

14   not so hard to get your mind around the legal concepts.  The

15   facts aren't terribly complicated, but it does require people

16   who know their business.  If you don't have qualified lawyers,

17   if you just go out and try to find the ordinary lawyer to bring

18   this case or, frankly, to defend this case, you're going to

19   have a nightmare and probably not get a good result for the

20   client.

21             So, it's not complex in the way we mostly think of

22   complexity.  It's not an antitrust matter, an abstruse tax

23   question, but it is specialized and we're fortunate that both

24   sides were represented by specialists.

25             Just as a selfish matter, of course, I as the judge

1  always like to have really good lawyers in my court; and I feel

2  I have really good lawyers in this case.

3          So, all of the factors weigh toward awarding a fee.  A

4  third is not something -- well, some of these cases go above

5  it.  To me, a third is about the maximum that I would award in

6  a case like this; and a third I also observed in similar cases

7  is the sort of fee that's regularly awarded by courts when they

8  consider contingent fees in similar matters.

9          So, that, I think, supports the fee; and of course as

10  Mr. Stranch has already observed, the plaintiffs' counsel have

11  agreed to bear the expenses of the matter which I take it,

12  Mr. Stranch, includes the expense of the notice.

13          Is that correct?

14          MR. STRANCH:    That's correct, your Honor.

15          THE COURT:    And I might also say that by bearing that

16  cost, plaintiffs' counsel have eliminated the need for a class

17  administrator who would ordinarily handle such matters.  Of

18  course, in this case you really don't need an administrator

19  with only 775 class members but the other side of it is an

20  administrator would probably be approved if requested and

21  taking that work on is both expensive and time consuming.

22          So, for all those reasons it seems to me that the fee

23  in this matter, the requested fee, is appropriate.  It's a

24  reasonable fee.  I note that nobody is opposed to the fee.  My

25  experience in Fairness Hearings is if there's going to be any

1    opposition, written or personal, it's to the legal fee.  Rarely

2    do people -- sometimes people come in and say it's not enough,

3    meaning their recovery's not enough, the individual class

4    member.  Usually what you hear is, "Well, we're okay; but I

5    don't think those lawyers are entitled to all that money."  We

6    haven't had any opposition to the fee.

7            So, I think that's most of what I want to say about

8    this matter.

9            I should also say that I think this is not an

10   appointed matter.  The plaintiffs chose their counsel.  So,

11   that also goes toward justifying the fee.  Not only did the

12   plaintiffs agree to the amount but they chose the lawyers they

13   wanted to represent them, and I must say the result

14   demonstrates that they chose well.

15           For all those reasons it's the Court's opinion that

16   the settlement is fair, reasonable, and adequate to the class;

17   that the attorney fee request is appropriate and fair,

18   considering the factors mandated by the Court of Appeals in

19   this Circuit.

20           I'm going to award $10,000 to Mr. Owens and $10,000 to

21   Ms. Thurston as the class representatives for their efforts in

22   bringing this matter.

23           The settlement is approved in its terms, and it's also

24   approved in its amount.  The claims of the Subclass A claimants

25   and the Subclass B claimants are approved as set forth in

1    Sealed Document 45 filed with the Court on April 28th, 2010.  I

2    might say that's a sealed document because it contains personal

3    information about the individuals, not because the Court has

4    any concern about publication of the details of the settlement.

5    The fund under that calculation is $2,080,000.  Plaintiffs'

6    counsel would be entitled to one third of that fund allocable

7    to the firms involved.

8                    What have I left out so far, Mr. Stranch?

9                    MR. STRANCH:    Your Honor, I think you've covered about

10   everything.

11                   THE COURT:    Is there anything, any issue I haven't

12   addressed that's of concern?

13                   MR. STRANCH:    No, your Honor.  I believe you've

14   covered everything wonderfully.

15                   THE COURT:    What do you have to say, Mr. Ireland?

16                   MR. IRELAND:    I'm in agreement with Mr. Stranch, your

17   Honor.

18                   THE COURT:    I may have to reconsider that other issue,

19   if there's such agreement here.

20                   MR. STRANCH:    That makes three times, your Honor.

21                   THE COURT:    Well, I had an old friend who was in the

22   State -- I had two old friends who were in the State Senate and

23   they didn't get along and one of them decided to retire but

24   they never agreed on anything.  They were constantly fighting

25   and bickering, and the one who decided to retire one day caught

1    his opponent agreeing with him.  It was Bob Rochelle.  You

2    might remember Bob.  Wonderful guy.

3              He recorded his opponent saying, "You're right again,

4    Senator Rochelle."

5              On the day of his retirement, he stood among the

6    Senate and played that over and over and over.

7              I've gotten to the point in life where I'm going to

8    start recording lawyers when they agree with me so I can play

9    it back to them.

10             In any event, the settlement is approved.  The motion

11   is granted.  The settlement's fair, reasonable, and adequate

12   and approved in all respects.

13             I will retain jurisdiction with respect to matters

14   arising from or relating to the implementation of the order,

15   but I will be entering the appropriate order.

16             Anything else?

17             MR. STRANCH:    No.

18             THE COURT:    If not, thank you very much.

19             MR. STRANCH:    Thank you, your Honor.

20             THE COURT:    Thank you, those of you who are here

21   today.  It's been a pleasure to have you in court.  I hope you

22   get your money soon.  If you don't get it, just call

23   Mr. Stranch.  He's only a phone call away.

24             (Whereupon the proceedings adjourned.)

25

Nicole M. Warren, CSR, RMR, CRR

**C E R T I F I C A T E**

I, Nicole M. Warren, do hereby certify that the foregoing

pages are, to the best of my knowledge, skill, and ability, a

true and accurate transcript from my stenotype notes in the

matter of:

SEAN OWENS AND MELINDA BEAN, ET AL V. CARRIER CORPORATION

Dated this 15th day of July, 2010.

Nicole M. Warren, CSR, RMR, CRR
Official Court Reporter
United States District Court
Western District of Tennessee

Nicole M. Warren, CSR, RMR, CRR